[Civ. No. 6685. Second Appellate District, Division Two.—May 2, 1931.]

R. L. POWERS, Respondent, v. CENTRAL SURETY & INSURANCE CORPORATION (a Corporation) et al., Defendants; M. G. ·ALVORDIAN, Appellant.

Condee and Spencer for Appellant.

Harold N. Nuzum for Respondent.

THOMPSON (IRA F.), J.—The defendants Teel and Alvordian were the successful bidders for the making of certain public improvements contemplated by the county of Los Angeles. They entered into a contract with the plaintiff whereby the latter was to do the grading and construct the sub-base upon a street known as Madison Avenue. After performing a part of the work the plaintiff ceased operations and brought this action, claiming that he was prevented from completing his contract by the action of the defendants. The trial court sustained his contention and rendered judgment in his favor. The defendant Alvordian only prosecutes this appeal therefrom.

The appellant insists that the testimony is insufficient to support the finding that the defendants breached the contract and contends that it demonstrates beyond doubt that the respondent abandoned the work because he did not have the resources with which to prosecute the job to completion. A short *résumé* of the testimony discloses ample foundation for the lower court's conclusions. The respondent testified that after he had done all the rough grading it was possible to do he made a demand for some money and that the engineers of appellant came and looked the job over; that "they couldn't find any fault with it; . . . I asked Mr. Reynolds . . . if there was anything more I could do that would make the job look better to him so he would accept it, to get my money . . . and he said, "There isn't anything I can say you can do any more until the sewer is in.'" He further added that the defendants "stalled along for three weeks or a month before they finally made the deal with Mr. Kovacevich to take over the entire job"; that he asked the defendants "several times when they were going to complete the job and they wouldn't give me any satisfaction, neither would they give me the balance of my money"; that he talked with Mr. Teel or Mr. Alvordian several times, "but they informed me that the bonding company and the surety company were going to take the job away from them; that they didn't have enough money to finish, and that the bonding house was going, in order to protect themselves, they were going to take the job away from them"; that he talked to Mr. Harri-

son of the Central Surety and Insurance Company and that Mr. Harrison told him "they were going to let the job to somebody and if I would put up a bond and go ahead and finish the work myself they would consider a bid from me, and if not that I was just figured out of the picture, had no more to do with the ·deal. . . . I told him I had a contract already and I wasn't going to put up bond. . . . that if there was any bond put up I would figure they ought to put it up in favor of me and not me put it up in favor of them, that I had my equipment and machinery to go ahead and finish the work"; that Mr. Alvordian told him he (Alvordian) "couldn't do a blessed thing; it was up to the insurance company; that they had taken the job away from him and he didn't know what they were going to do"; that he then went to Mr. Harrison and "he informed me I would have to release my contract and I told him I wouldn't do it". On cross-examination the plaintiff was asked the question: "And isn't it a fact you went up to Mr. Harrison's office and you had a conversation something to this effect, you stated to Mr. Harrison that you couldn't go ahead and complete the job, you didn't have the money to meet your pay roll and that he told you that he was sorry but he was out of the picture, that it was Teel and Alvordian's job and the Central Surety wouldn't have anything to do with it? A. Absolutely not. . . . I never told nobody I was going to throw the job up and not finish it . . . I am positive no such conversation ever took place. Q. You didn't have any money on this particular job to pay your payroll? A. Yes, I had money to pay all my bills."

The witness Knowles testified that he was foreman and superintendent for the defendants and supervised the work of plaintiff; that when plaintiff finished the rough grade it was in fair shape; that the plaintiff was then prevented from doing any more work until the sewers were put in, that at the request of defendants he, the witness, then employed a man named Kovacevich to finish the work; that defendants stated plaintiff "wasn't capable of finishing the job". On cross-examination he was asked the question: "Also, isn't it a fact that the engineer in charge of the job there . . . went out there and refused to accept the job? A. No. . . .

He didn't refuse to accept it. He told Mr. Powers it was as good as he could get at the present time.'' He further testified: ''We estimated that, Mr. Teel and Mr. Alvordian, there was practically all of the dirt to be taken out of there that was necessary until they put the sewer in. Mr. Teel told Mr. Powers that there was nothing further he could do now.'' He was asked the question: ''Did Powers ever go back and do any work on there? A. He was ready to go back, left his tractor set there for two weeks.'' He further testified that about the time Powers had finished the grading ''the company blowed up'' and that he (the witness) ''had to quit''. It is unnecessary to comment upon this testimony because on its face it justifies the court's findings.

We see no merit in the contention of appellant that the trial court erred in not allowing him to testify concerning the payment of certain bills by the respondent to people other than the defendants. It would be sufficient to say that the subject of the proffered testimony was remote and collateral, but further than that we fail to see how it could possibly prove an abandonment of the contract on the part of the respondent.

It is next claimed that the court erred in holding that the defendants failed to establish the qualifications of a Mr. Arnold as an expert witness on the subject of the cost of completing respondent's contract. The witness testified that he had been auditing accounts on road improvements for a period of seven years and ''more or less for . . . twenty years''; that in that connection it was necessary at different times ''to compute the estimated cost of completing projects from certain periods'' to ''estimate the yardage or procure an estimate of yardage and compute the average cost based on street or building work''; that he had never been a contractor but had been associated with them as an accountant; and that he had gone on the job for the purpose of estimating the material to be removed and the number of men to be employed. We do not find anything in the testimony of the witness to show that he had expert knowledge of construction costs. He evidenced long experience as an auditor but not as a contractor. The rule is well established that the question of whether a witness is qualified as an expert is within the sound discretion

of the trial court, and in the absence of a clear abuse of that discretion this court will not disturb that conclusion.

Judgment affirmed.

Works, P. J., and Craig, J., concurred.